IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRIDGET A. MARTINEK, | CASE NO. 1:25-CV-01735-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Bridget A. Martinek challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1) The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Aug. 21, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #7). For the reasons below, I **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Martinek applied for DIB on March 20, 2023, alleging she became disabled on March 10, 2023. (Tr. 588). After the claim was denied initially and on reconsideration, Ms. Martinek requested a hearing before an Administrative Law Judge. (Tr. 487, 498, 501). In June 2024, Ms. Martinek (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 431-64). On July 30, 2024, the ALJ determined Ms. Martinek was not disabled. (Tr. 408-24). On June 18, 2025, the Appeals Council denied the request for review of the ALJ's decision,

1

making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4; *see also* 20 C.F.R. § 404.981). Ms. Martinek timely filed this action. (ECF #1).

FACTUAL BACKGROUND

## I. Personal and Vocational Evidence

Ms. Martinek was 51 years old on her alleged onset date and 53 years old at the administrative hearing. (*See* Tr. 466, 431). She completed high school and some college. (Tr. 440). She has worked as an insurance clerk. (Tr. 459).

## II. Relevant Medical Evidence[1]

Ms. Martinek has a history of gout, a form of inflammatory arthritis caused by too much uric acid built up in the joints.[2] She has long been treated by rheumatologist Gheorghe Ignat, M.D., since at least 2018, years before the date she claimed her disability began. (*See* Tr. 1027). In April 2020, she presented to Dr. Ignat for routine gout treatment and her gout was diagnosed with an "unspecified chronicity." (*Id.*). She is prescribed allopurinol and colchicine to control her gout and naproxen injections to reduce the joint pain and swelling gout causes.[3] (*Id.*). She also keeps a low-purine diet to control her uric acid levels, which is produced by digesting purines. (*Id.*).

---

[1] Ms. Martinek challenges the ALJ's evaluation of her treating rheumatologist's medical opinion about the impact of her gout on her functioning. I thus limit my discussion of the record to Ms. Martinek's gout.

[2] *See Gout, MedlinePlus*, http://medlineplus.gov/gout.html (last accessed June 17, 2026).

[3] Allopurinol is a medication prescribed to treat gout by reducing the buildup of uric acid in the body that causes attacks of redness, swelling, pain, and heat in joints typical of gout. *See Allopurinol, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682673.html (last accessed June 17, 2026). Colchicine is an anti-gout agent that stops swelling and other symptoms of gout. *See Colchicine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682711.html (last accessed June 17, 2026). Naproxen (or its brand-name version, Aleve) is used to relieve pain, tenderness, stiffness, and swelling from various causes, including gout. *See Naproxen, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a681029.html (last accessed June 17, 2026).

2

Ms. Martinek next returned to Dr. Ignat in March 2022 after a gout flare-up that began two weeks prior and was relieved with colchicine. (Tr. 760-61). A physical examination found tenderness and swelling in the first metatarsophalangeal (MTP) joint (the big toe knuckle) of her left foot. (Tr. 761-62). She also reported being unable to perfectly maintain a low-purine diet. (Tr. 761). Dr. Ignat continued her dose of allopurinol, and instructed her to take colchicine and pain relievers only as needed for acute gout flare-ups due to her liver fibrosis. (Tr. 760).

In March 2023, the month she reported her disability began, Ms. Martinek presented for a regular diabetic foot exam where she reported wanting to follow up with her rheumatologist after a recommendation from her gastroenterologist. (Tr. 781). She reported joint pain and temporary morning stiffness but did not mention any gout flare-ups or foot swelling. (*See* Tr. 781-82, 789). Ms. Martinek returned to Dr. Ignat later that month complaining of finger pain and leg swelling and achiness while walking. (Tr. 805). Dr. Ignat also noted Ms. Martinek had "more pain in her hands, hips, left, and more weakness." (Tr. 806). Dr. Ignat assessed "[c]hronic gout of multiple sites, unspecified cause" and noted it is "relatively controlled with Allupurinol and Colchicine" but Ms. Martinek "still [has] intermittent flares in her feet." (Tr. 805-06). A physical examination found tenderness with mild swelling in her left big toe consistent with gout. (Tr. 807). Dr. Ignat continued Ms. Martinek's medications. (*Compare* Tr. 806 *with* Tr. 760).

In a consultative psychological examination in connection with her benefits application, Ms. Martinek reported in July 2023 she "may have a gout flare once a year." (Tr. 996). In September, she did not report recent gout flares to her internist, she denied painful joints and weakness, and a physical examination did not note any swelling. (Tr. 1008, 1017). In an October

medical appointment for back pain, Ms. Martinek endorsed arthritis, but she denied having gout symptoms. (Tr. 1246).

In a January 2024 appointment for bruises on her legs, Ms. Martinek did not report recent gout flares to her internist, she denied painful joints and weakness, and a physical examination did not note any swelling. (Tr. 1398, 1400). At a regular diabetic checkup in March, Ms. Martinek denied fatigue and a physical examination did not find swelling. (Tr. 1589, 1599). She was continued on colchicine as needed for gout. (Tr. 1600).

In June 2024, Ms. Martinek underwent a functional capacity assessment in connection with her application for benefits where she reported she "[r]ecently went through a gout flare-up in the left foot about 1 year ago and was in a walking boot for 2 weeks" but "[s]ince then she has been doing well regarding her gout flare-ups." (Tr. 1976). Ms. Martinek followed up with Dr. Ignat in December 2024, the first visit since March 2023. (Tr. 338). Dr. Ignat recounted her gout was "relatively controlled with Allopurinol and Colchicine" though with "intermittnet [*sic*] flares in her feet." (Tr. 339). Ms. Martinek reported painful and swollen joints and a physical examination found no acute flare of gout in her left MTP joint though she did have tenderness and mild swelling. (Tr. 340). Dr. Ignat instructed her to continue taking allopurinol regularly and colchicine only as needed and additionally prescribed a daily triamcinolone acetonide cream.[4] (Tr. 339). Ms. Martinek followed up a week later to discuss results of various tests Dr. Ignat had ordered but the results were inconclusive. (Tr. 263-64). She reported pain and swelling in her joints. (Tr. 265). A

---

[4]     Triamcinolone is a topical steroid that reduces swelling, redness, itching, rashes, and inflammation of the skin. *See Triamcinolone Aerosol, Cream, Lotion, Ointment, Cleveland Clinic*, http://my.clevelandclinic.org/health/drugs/20405-triamcinolone-aerosol-cream-lotion-ointment (last accessed June 15, 2026).

physical examination again found no acute flare of gout in her left MTP joint though she did have tenderness and mild swelling. (Tr. 266). Dr. Ignat continued her medications. (Tr. 263-64).

In February 2025, Ms. Martinek followed up with Dr. Ignat. (Tr. 244-46). A physical examination again found no acute flare of gout in her left MTP joint though she did have tenderness and mild swelling. (Tr. 246). Dr. Ignat continued her medications from December 2024. (*Compare* Tr. 246 *with* Tr. 339). In May, she followed up with Dr. Ignat for joint pain in her thigh and hands. (Tr. 17-20). A physical examination again found no acute flare of gout in her left MTP joint though she did have tenderness and mild swelling. (Tr. 19). Dr. Ignat continued her medications. (Tr. 18).

### III.  Relevant Opinion Evidence

On April 26, 2023, state agency medical consultant Jerry Davis, M.D., opined Ms. Martinek can lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for six hours each in an eight-hour workday; frequently climb ramps and stairs, kneel, crouch, and crawl; occasionally climb ladders, ropes, or scaffolds; and has limited capacity for gross and fine manipulation with both hands. (Tr. 471-72).

On December 9, 2023, state agency medical consultant Steve McKee, M.D., reviewed updated medical records but was unable to reach Ms. Martinek for clarification and so concluded there was insufficient evidence to issue an opinion on reconsideration review. (Tr. 480). Dr. McKee did note the findings on initial review were consistent with and supported by the initial evidence. (*Id.*).

On June 26, 2024, Dr. Ignat (Ms. Martinek's treating rheumatologist) completed a "medical source statement regarding gout" and an "off-task/absenteeism questionnaire." (Tr. 1989-91). Dr. Ignat opined because of Ms. Martinek's joint swelling, fatigue, and

5

hyperuricemia (high levels of uric acid), she can stand/walk for less than two hours in an eight-hour workday, stand for 15 minutes at a time, and sit for about two hours. (Tr. 1989). Dr. Ignat also characterized Ms. Martinek's pain as moderate and opined she would miss work about four times a month due to her condition. (Tr. 1990). Dr. Ignat further opined Ms. Martinek would be off-task at least 20% of the workday due to her impairments, inability to sustain concentration or focus, pain, drowsiness, and the side-effects of her medications. (Tr. 1991).

## IV. Relevant Testimonial Evidence

Ms. Martinek reported her last gout flare-up was in March 2023, about a year before the hearing. (Tr. 453). Her gout flares up in her left foot, on the inner side, and on top of her ankle and leaves behind purple blisters. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Martinek's work after the alleged onset date of March 10, 2023 did not rise to the level of substantial gainful activity. (Tr. 410). At Step Two, the ALJ identified the following severe impairments:

> [D]egenerative changes of the lumbar spine, minimal degenerative changes of the left hip, plantar and dorsal calcaneal spurs and mild degenerative changes of the first metatarsal phalangeal joint in the left foot, mild acromioclavicular and glenohumeral joint osteoarthritis of the left shoulder, fat containing umbilical hernia with mild stranding, hepatic steatosis, liver disease, fibrosis, diabetes, gout, tachycardia, essential hypertension, hyperlipidemia, asthma, obstructive sleep apnea, gastroesophageal reflux disease, obesity, depression, anxiety, anxiety, posttraumatic stress disorder, and specific learning disorder.

(Tr. 411). At Step Three, the ALJ found Ms. Martinek's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 411-15).

7

At Step Four, the ALJ determined Ms. Martinek's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can frequently operate right and left foot controls. She can occasionally reach overhead on the left. She can frequently reach in all other directions with the left upper extremity. She can frequently handle and finger bilaterally. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. She could never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. She could frequently be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. She has the ability to understand, remember, and carry out simple instructions. She is able to use her judgment to make simple work-related decisions. She cannot perform work requiring a specific production rate (*i.e.*, assembly-line work). She is able to deal with occasional changes in a routine work setting. She is able to frequently interact with supervisors and coworkers, and occasionally interact with the public.

(Tr. 415) (cleaned up). The ALJ found Ms. Martinek cannot perform her past relevant work as an insurance clerk. (Tr. 422). At Step Five, the ALJ found Ms. Martinek could perform other work, including as a router, order caller, and cleaner/housekeeper. (Tr. 423). Thus, the ALJ concluded Ms. Martinek was not disabled. (Tr. 424).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

8

reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

### DISCUSSION

Ms. Martinek argues the ALJ mis-evaluated the opinions of Dr. Ignat, her treating rheumatologist, by mischaracterizing the record as showing a lack of treatment for gout after the alleged onset date when the record showed ongoing treatment. (*See* ECF #10 at PageID 2241-42). The Commissioner counters that Dr. Ignat's opinion is a check-box opinion that did not warrant extensive discussion and the ALJ did not find Ms. Martinek had *no* treatment or gout flares since the alleged onset date, but rather the ALJ found Ms. Martinek would not miss work three-to-four times a month due to treatment or gout flares *combined* and that finding is supported by the record. (*See* ECF #12 at PageID 2253-54). Ms. Martinek replies the Commissioner's check-box argument is an impermissible post-hoc rationale for the ALJ's action and points out Dr. Ignat opined Ms. Martinek would be absent three-to-four times a month because of her impairments *or* treatment. (ECF #13 at PageID 2257).

In assessing the claimant's RFC, the ALJ must review all medical opinions and prior administrative findings and explain how persuasive he finds them. *See* 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R § 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the

10

supportability and consistency factors for a medical source's medical opinion," the two most important factors. *See id.* § 404.1520c(b)(2). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence," (supportability) and "how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim" (consistency). *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

The ALJ addressed Dr. Ignat's opinions as follows:

> On June 26, 2024, Gheorghe Ignat, M.D. completed a questionnaire in which he stated that she had gout manifestations for more than 2 years. Her symptoms were swelling, fatigue, and hyperurelemia [*sic*]. She could stand and/or walk less than 2 hours in an 8-hour workday. She could stand for 15 minutes at a time. She had moderate pain. She would likely be absent from work three to four days per month. This opinion was given by the claimant's treatment provider, but it was not persuasive because the record reflected some treatment for episodes of gout prior to the alleged onset date, but during the relevant period, the claimant did not pursue treatment or complain in the medical records of gout flares at the frequency of three or four times per month.

(Tr. 421) (citations omitted).

Ms. Martinek is correct that the ALJ did not criticize Dr. Ignat's opinions as checkbox forms. (ECF #13 at PageID 2257). Nevertheless, the Commissioner is also correct that the court may consider the issue. (ECF #12 at PageID 2252-53). As the Sixth Circuit explained in an

11

unpublished decision, "in large part, an agency's decision must be affirmed on the grounds noted in the decision" but also the court "can look to see if the error is harmless." *Berryhill v. Shalala*, 4 F.3d 993 (table), 1993 WL 361792, at *6 (6th Cir. 1993). One reason an ALJ's error in rejecting an opinion can be harmless is if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *See Hernandez v. Comm'r of Soc. Sec.*, 644 F.App'x 468, 474 (6th Cir. 2016). And a medical opinion can be "patently deficient" when it involves "check-box analysis . . . not accompanied by any explanation." *Id.* at 474-75. Though reviewing courts sometimes blur the line between discussing if the ALJ erred in analyzing an opinion and whether that error is harmless, a court can still consider whether an opinion was rendered in checkbox form as part of the harmless-error analysis even when the ALJ does not criticize an opinion as such. *See Gallagher v. Berryhill*, No. 5:16-cv-1831, 2017 WL 2791106, at *9 (N.D. Ohio June 12, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 2779192 (N.D. Ohio June 27, 2017). Nevertheless, I will maintain a strict separation.

## I.      The ALJ's evaluation of Dr. Ignat's opinions

Turning to whether the ALJ erred in evaluating Dr. Ignat's opinion, although the ALJ did not name the supportability and consistency factors, the ALJ applied those factors as well as expressly applied the treating-relationship factor. The ALJ found Dr. Ignat's opinion that Ms. Martinek would be absent from work three-to-four days a month for gout treatment unpersuasive because "the record reflected some treatment for episodes of gout prior to the alleged onset date, but during the relevant period, the claimant did not pursue treatment or complain in the medical records of gout flares at the frequency of three or four times per month." (Tr. 421). As written, this statement is ambiguous as to whether the modifier "at the frequency of three or four times per

12

month" describes just the frequency of Ms. Martinek's gout flares or the frequency of both her treatment and complaints of gout flares combined. This ambiguity caused the parties to disagree on what the ALJ found. Ms. Martinek reads the ALJ's sentence as finding she did not pursue *any* gout treatment after the alleged onset date (when she demonstrably did) and she did not have three-to-four monthly gout flareups. (ECF #10 at PageID 2241-42; ECF #12 at PageID 2257 ("Dr. Ignat did not opine that Plaintiff experienced three to four separate gout flareups per month as the ALJ stated")). The Commissioner reads the sentence the other way—that the ALJ found treatment and flareups combined did not occur three-to-four times a month. (ECF #12 at PageID 2253) ("[C]ontrary to Plaintiff's assertion, the ALJ did not state that Plaintiff had not sought any treatment for gout during the period at issue, only that she had not sought treatment or complained of gout flares occurring three to four times per month.").

Ms. Martinek's reading has support from the tools applied in statutory interpretation. The rule of the last antecedent holds that "'[o]rdinarily,'" a court reads "'a limiting clause or phrase' to modify 'only the noun or phrase that it immediately follows.'" *Allen v. United States*, 83 F.4th 564, 568 (6th Cir. 2023) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). Were the ALJ's decision a statute, the rule of the last antecedent would suggest the modifier "at the frequency of three or four times per month" describes only the phrase that immediately precedes it: Ms. Martinek's complaints of gout flares. But "the rule is not absolute"; a court will "'typically' apply it—unless the 'context or the spirit of the entire writing' suggests otherwise." *Id.* (quoting *Lockhart v. United States*, 577 U.S. 347, 351 (2016)). Two pieces of context suggest the ALJ did not intend to use the last-antecedent rule but rather found Ms. Martinek's treatment and flareups combined did not occur three-to-four times a month.

13

First, looking elsewhere in the decision suggests the ALJ did not intend to find Ms. Martinek did not pursue any gout treatment after the alleged onset date and she did not have three-to-four monthly gout flareups. A reviewing court "read[s] the ALJ's decision as a whole and with common sense." *See Buckhannon v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010). As Ms. Martinek points out, the ALJ noted earlier in the decision that she pursued gout treatment on March 15, 2023—five days after the alleged onset date. (ECF #10 at PageID 2242) (quoting Tr. 417). It would be odd for the ALJ to find Ms. Martinek was treated for gout after the alleged onset date only for the ALJ to discount Dr. Ignat's opinion because such treatment never happened. Although the ALJ could have contradicted himself over three pages, a holistic reading of the decision suggests the ALJ intended to be consistent but was simply unclear.

Second, Dr. Ignat's opinions estimated Ms. Martinek would be absent from work for both treatment and symptoms about three-to-four times a month. The first opinion estimated Ms. Martinek would be "absent from work as a result of his/her gout, complication of this condition, or treatment for same" about three or four times a month. (Tr. 1990). The second opinion noted she would have "about 4x's a month" of absences from "impairments or treatments." (Tr. 1991). Thus, as Ms. Martinek points out, "Dr. Ignat did not opine that Plaintiff experienced three to four separate gout flareups per month." (ECF #13 at PageID 2257). Rather, Dr. Ignat opined Ms. Martinek "would be absent from work because of her impairments or treatment three to four times per month." (*Id.* at PageID 2257-58). As the ALJ was analyzing Dr. Ignat's opinion and Dr. Ignat estimated three-to-four monthly absences from both treatment and symptoms, it would make sense for the ALJ to have borrowed Dr. Ignat's structure.

14

Taken together, the decision as a whole and the context of Dr. Ignat's opinions suggests the ALJ found the record did not support Dr. Ignat's opinions that Ms. Martinek would have three-to-four monthly absences from both treatment and symptoms combined. This reasoning engaged with both the supportability and consistency factors even though the ALJ did not call out those factors by name by interrogating whether other evidence documents three-to-four monthly gout treatments or gout symptoms combined. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. at 5859 (defining supportability and consistency).

Substantial evidence supports this finding as Ms. Martinek's treatment and reported gout flareups combined do not come close to three-to-four times a month. About 17 months elapsed from the date Ms. Martinek claimed she became disabled in March 2023 through the ALJ's decision in July 2024. Using those 17 months as a reference, under Dr. Ignat's expected three-to-four monthly absences, there would be 51 to 68 absences from work for gout treatment or gout symptoms expected. Her treatment records document just five visits to Dr. Ignat for gout treatment over that period: March 2023 (Tr. 805-07), two in December 2024 (Tr. 338-40, 263-65), February 2025 (Tr. 244-46), and May 2025 (Tr. 17-20). Going back to the beginning of the record adds two more: a visit in April 2020 (Tr. 1027-28) and another in March 2022 (Tr. 760-62). While Ms. Martinek does take regular medication for her gout, she does not argue, nor is there anything in the record to suggest, those medications would cause her to miss work.

Using these additional visits, this leaves 44 to 61 absences expected from gout symptoms in the 17 months since the alleged onset of her disability. The record does not support the conclusion that Ms. Martinek reported gout symptoms anywhere approaching that frequency. In a consultative psychological examination in connection with her benefits application, Ms. Martinek

15

reported in July 2023 she "may have a gout flare once a year." (Tr. 996). In the administrative hearing in June 2024, Ms. Martinek reported her last gout flare-up was in March 2023, a year before the hearing. (Tr. 453). In a functional capacity assessment in June 2024, Ms. Martinek reported she "[r]ecently went through a gout flare-up in the left foot about 1 year ago and was in a walking boot for 2 weeks" but "[s]ince then she has been doing well regarding her gout flare-ups." (Tr. 1976). Ms. Martinek's treatment records also do not show flare-up symptoms occurring with that kind of frequency. In her visits with Dr. Ignat, no physical examination found an acute gout flare; the closest finding was tenderness and mild swelling in her foot. (*See* Tr. 1028, 762, 807, 340, 266) (ordered chronologically). Dr. Ignat's examinations after Ms. Martinek's administrative hearing yielded the same findings. (*See* Tr. 246, 19). Treatment records and isolated statements to providers do not capture the entirety of Ms. Martinek's condition and she may not report every experience of gout symptoms. But all the treatment records and her own statements suggest that at most, she experiences gout flares annually.

Thus, substantial evidence supports the ALJ's finding that the record did not support, and was not consistent with, Dr. Ignat's opinions that Ms. Martinek would have three-to-four monthly absences from both treatment and symptoms combined. The record documents just seven visits for gout treatment since 2020, Ms. Martinek has stated multiple times she may have gout flareups once a year at most, and her treatment records do not document monthly gout flareups.

The ALJ also expressly considered the treating-relationship factor under 20 C.F.R. § 404.1520c(c)(3). The ALJ noted Dr. Ignat's "opinion was given by the claimant's treatment provider." (Tr. 421). Though the ALJ found Dr. Ignat's opinion to be unpersuasive based on the supportability and consistency factors, that the ALJ considered the treatment-relationship factor

16

and balanced it against the others confirms the ALJ analyzed the opinion using the required regulatory framework.

I thus decline to order remand on this basis.

## II. Whether any error was harmless

Because I find the ALJ did not err in evaluating Dr. Ignat's opinions, I need not reach the Commissioner's argument that any error would be harmless because the opinions are allegedly patently deficient check-box forms or Ms. Martinek's reply on that issue. (ECF # 12 at PageID 2252-53; ECF #13 at PageID 2257).

### CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: June 17, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

17